The Honorable Judges of the United States Court of Appeals in and for the 7th Judicial Circuit, hear ye, hear ye, hear ye, all persons having witness before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning, everyone. Judge Hamilton, Judge Scudder, and I are very happy to have you all here today. And we're going to call the first case. 222575, Terry Kass v. PayPal Incorporated. Good morning. Good morning. I believe it's Mr. Lending. Yes, correct. Good morning. You may begin anytime you are ready. I'm ready, Judge. May it please the Court. Randall Lending on behalf of the appellant, Terry Kass. I wanted to start with a quick overview of this case. This case is about Defendant's 2016 holiday campaign when PayPal solicited customers like Ms. Kass to make year-end charitable donations. Defendant's solicitations in late 2016 falsely represented that it was not too late to donate to the donor's favorite cause before year-end, and that 100%, actually 101% because PayPal was adding a percentage, of the amount donated will go to the charity of the donor's choice. What the defendants did was that they improperly used the names, logos, and mission statements of over a million unenrolled, not-for-profit organizations without their authorization to create profile pages for these unenrolled charities on their website. Ms. Kass went to the profile pages, saw the charities that she wanted to donate to, saw the names, logos, mission statements, and saw that they were listed as trusted organizations and proceeded to make her donations. But unbeknownst to her and others that were making donations, the donations were really being made to the PayPal Giving Fund, Defendant's own 501c3 organization, and not to the charities that she selected. She filed the instant case when she learned from defendants that none of the 13 charities she had selected had received the donations before year-end, and that 10 of the 13 were told that they would not receive the monies donated by her unless and until they opened accounts. And we know that this scheme did work, that there was more than $10 million in donations that were made during the holiday campaign, and almost 11,000 unenrolled charities were selected as recipients. We know that many of the unenrolled charities proceeded to enroll and signed up with PayPal and business accounts to get the donations that they had made, or that the donors had made. Now I want to turn to the specific arguments on appeal. First, the district court erred in finding the arbitration clause binding on Ms. Kass. And to start with, I want to just note that Ms. Kass has a constitutional right, as has been found by many courts, to have her claims be resolved by an Article III tribunal. While this right can be waived, the waiver has to be knowingly and voluntarily. And in this case, Ms. Kass did not knowingly and voluntarily waive her right and consent to arbitration. Mr. Lending, may I just start you off here? Sure. You argue in the briefs that the definitional language in the 2012 user agreement, which defines PayPal as including its subsidiaries and affiliates, does not require arbitration of the claim here because that language was not present in the 2016 user agreement. Now, in footnote three of your opening brief, which is at page 16, however, you make clear that no one claims that the 2016 user agreement was communicated to Kass or that it applies here. And all the arguments below addressed the 2012 user agreement. Why then does not the definitional language in the 2012 user agreement control here? Judge Rovner, that's an excellent question. With respect to the 2012 agreement, you are correct. There is a definition generally that says that PayPal and its affiliates. But what we have here is the defendants have maintained throughout these litigation that the governing agreement is the 2016 agreement. And we've cited numerous places where they've said that. So what they're doing is they're going back to an argument that they actually never made. They conceded that PayPal Giving Fund was a non-signatory in various pleadings that they put forth. And as a non-signatory, they cannot now claim that they are included in the user agreement. But what they have done is now they've gone back to the 2012 agreement, which they themselves say is not the governing agreement, but it's the agreement that they claim to have provided notice to Ms. Kass. Ms. Kass has denied receiving that notice. In fact, she specifically put an affidavit saying, I never received the notice of the 2012 agreement. And they have put in an affidavit that says that she would have received notice because she was within the group. I'm going to interrupt you, I fear, because she didn't present any statement indicating that a search of her emails or her action provided a basis for her to believe that it was never received. And, you know, the fact that she says she doesn't remember receiving any such email would be a very inefficient basis to create an issue of fact, given, you know, the presumption that is inherent in the mailbox rule. And the only evidence that she points to is, you know, for not having received the email is that the defendants have acknowledged that the bulk emails, such as the amendment emails, are sent out in batches. And I'm afraid I don't understand how that would advance her case. Judge Roebner, first, I respectfully disagree that Ms. Kass did not put in an affidavit saying that she does not remember receiving. That was the language in the Tinder case. She has put in an affidavit, which is not conclusory. It's a statement of fact. I never received, I did not receive the email attached to his Exhibit 2 of the Squires Declaration. Look, it seems to me that what she did was she denied receiving the email. And my thought has been that, at a minimum, she needed to provide the basis for her belief at a point that was, what, I think almost six years later. And she did not do that. She specifically said, I did not receive. Now, I agree she did not go into more detail about that. But that statement alone is sufficient to create a triable issue of fact. And I recommend that the court look at the Longardner case. Because there, the court said an express denial of receipt of a communication is sufficient to create a disputed issue of fact. And compare that with the Tinder case. The Tinder case is what defendants have relied upon, which there, the sender definitively said, we sent the communication. Unlike PayPal, in this case, where they say it would have been sent. But there, the recipient said, I don't recall. I do not remember receiving. That is different than the statement of miscast. And therefore, under Longardner, there is a triable issue of fact by her mere statement saying that she didn't receive it. And it's short. She did not. It's akin to saying the light was red. She didn't say, or you don't have to say, well, I went past the intersection all these times. But she made the specific statement, I did not receive the email. And that is sufficient, we maintain, under Longardner and Tinder to create a triable issue of fact. Is it true of you, Mr. Lending, that the mailbox rule, properly understood, is a permissible inference as opposed to a conclusive presumption? It is a permissible inference. It is under the mailbox rule, which was misapplied here, as we've said. Because what Judge Gettleman did was he said that the mailbox rule creates the presumption that the notice was sent, received, and read. But the problem is, the defendants have not established the predicate. Judge Gettleman simply relieved them from the task of proving, or at least establishing, that it was sent to get the presumption. You only get the presumption of receipt and read if the sender can establish that it was sent. And what Judge Gettleman did was he said, OK, I'm going to presume that it was properly sent, received, and read. Do you think the defendant's evidence would be enough to permit a jury to infer that it was sent? We would say no, because they say- I would say yes, it's enough to permit the inference. It's like evidence of habit, standard operating procedures, right? OK, Judge Hamilton- So it's a permissible inference. Your point is, it's not conclusive. And our point is that the rebuttal to that was Ms. Cass' statement, I did not receive that. And that's what creates the triable issue of fact. And you want a jury trial under FAA Section 4 on that issue, right? That is correct, because the FAA says when there is a triable issue on whether a decision or an agreement to arbitrate was made, that's a fact question, and that is to be determined by a prior effect, and not just simply based on a presumption. And- Mr. Lundy, while we're on this point, and before we move to others, is if we, for purposes of discussion, assume we agree with you on that, and we remand for that trial that Judge Hamilton just referenced, the scope of the remand can be extremely limited, correct? In other words, that is the dispositive question at hand, whether she, in fact, agreed to arbitrate or not. Everything else can be put on hold. If that question is answered in her favor, the arbitration award is void. If it's not, go forward in court. Yes, Judge Scudder, you're absolutely correct. And it can be a very limited determination as to whether or not she, in essence, knowingly and voluntarily agreed to give up this right of hers and go to arbitration. What's interesting is the only user agreement she agreed to is the 2004 user agreement, which she had to click and agree to the terms. That did not contain a mandatory arbitration provision. The later arbitration agreements, the 2012 and the 2016, Ms. Cass never was asked to click. What the defendants say is, oh, she should have somehow gone to the website and searched before any time she used the PayPal service to see if there was any changes in the user agreements. And that, we submit, is not the case. But as to your specific question, yes, it would be a limited review as to whether or not she agreed to arbitrate. Okay, so let's move beyond that a second just because the time's running on you. Sure. Do you really think she was prejudiced or harmed by the arbitrators conducting this proceeding by telephone as opposed to video? I have a very difficult time seeing that. Yeah, and you have to start there with the premise that Ms. Cass was pro se. It's undisputed that the agreement up front was that it would be proceeding in person. Then it was switched to a telephonic and video hearing that was conducted to be set up by defendant's counsel. And Ms. Cass spent all this time and effort to prepare her arguments. No, I get that. But at the end of the day, the conference line worked over the telephone, and it sure seems to me that she was given, whether she took advantage of it, it's a different question, but was given a full and fair opportunity to make whatever points she wanted to make. Well, the problem is she did object, and the arbitrator said, okay, well, we'll allow you to present whatever evidence you want at the end. And then he pulled that back and said, nope, don't need anything more. She planned and prepared for an audio-video hearing where she would walk through a demonstration of the experience that she had, the specific website, the specific misrepresentations. But look, she did not demonstrate the significance of the excluded visuals. The district court, as I recall, noted that she didn't even identify the documents and visual aids that she was precluded from presenting. And she hasn't, therefore, it would seem, established that any of those exhibits or demonstratives, whatever, could have impacted the outcome. And it certainly didn't appear, perhaps I'm wrong, that she actually requested an adjournment. So, look, if she could have demonstrated what all of that included and what its significance were, well, we'd be in a completely different ballpark. But it didn't seem that she did. So Judge Roepner, she did object, and we've cited to the record where she did object, and it's in her affidavit. In terms of her being denied a fundamentally fair proceeding, we believe that she was. She was pro se at the time. She could not present her arguments in the manner and method in which she had prepared. And she could not, and in terms of the specifics, she did provide information on an exhibit showing what she wanted to have been able to provide. But I wanted, in the last couple minutes, because I know that my time is running down, I wanted to go back to the points that she did not agree to arbitrate. And I think there's two important points here. First, she never agreed, and it creates a question of fact. But even if she did agree, what's important to know is that she didn't agree to arbitrate claims against PayPal Giving Fund, and that's not arbitrable. And also, her consumer fraud claims are not arbitrable. And non-signatories to a contract cannot invoke the provisions of a contract, and what they are now trying to do is rely on this equitable estoppel theory. But there is just no evidence that she did anything that induced PayPal Giving Fund to detrimentally rely on her actions. And because of that, they are not a party to the arbitration provision. They are nowhere listed in any of them. The governing agreement, as I said, was the 2016. That's what they say, not us. We say the governing agreement is, of course, the 2004 agreement. I thought the equitable estoppel point's a different point. Mr. Hochman can tell me I'm wrong, but I thought the point there was about a Delaware law inclusion of essentially like a necessary party as opposed to what, you know, the way you articulated was much more kind of common law equitable estoppel. Yeah, so I would refer the court to the Sosa case. The Sosa case said in order to employ an equitable estoppel argument to get a non-signatory bound by an agreement, the non-signatory has to show that they were somehow induced to act and detrimentally relied upon it. The district court looked to Delaware law, this substantial interdependent and connected theory that was set forth in the Insight case. We would submit that that is not the appropriate law. But in the Insight case, what's important to note there, even if you look at the Insight case and apply Delaware law, the claims in this case do not depend on the user agreement. The user agreement has nothing, that relates to PayPal solely as a payment processor. This is charitable fundraising claims that are outside of the user agreement, and they in no way depend on that user agreement. And in the Insight case, there were claims that were related to the confidentiality agreement at issue, tortious interference with contract. The court said, yeah, that's related. However, a trade secret misappropriation is not related. If it's not related, and it doesn't depend on the contract, it's not under Delaware law under the Insight applicable. And here, Cass has not said that there's any type of tortious interference with the user agreement against PayPal Giving Fund. She hasn't said there's a breach by PayPal Giving Fund of the user agreement. Her claims relate completely outside of user agreement. I'm going to reserve the remaining time for remote. Sorry, just a moment, please. I will give you some time for rebuttal, but I do have a question that I have been thinking about. I'd really like to hear the answer, because the arbitrator determined that Miss Cass never demonstrated any compensable damages because the funds were all distributed to the proper recipients by April of 2017. And that any allegation of embarrassment at the minimal delay here wasn't a harm that could be compensable with an award of damages. Now, do any of the arguments as to the fairness of the arbitration agreement, or rather the arbitration hearing, not the agreement, the hearing, I'm sorry, and the failure to consider exhibits relate to the damages issue? Yes, and I would submit that the arbitrator got it wrong on the damage issue. There are multiple claims that do not require damages. And had she been able to submit her additional evidence, she could have addressed it. One of the things was under Delaware law, she wanted to present the Delaware statute, which presumes in this type of situation where there has been a misuse of name and logos of a charity without their authorization, that is per se fraud under the Delaware statute. But there are other things here. She doesn't need to show injury. She has claims for conversion, declaratory relief. But she did show, and had she been allowed to present her arguments, she could have said, hey, this is a destruction of the donor-donor relationship. That's the injury she sustained, in addition to attorney's fees, punitive damages, unjust enrichment, and other claims that she had. But she wasn't allowed to present evidence after the hearing, as she was told that she would be allowed to do. OK. Well, thank you very much. And as I said, I will give you a couple of minutes. Thank you, Judge Rogler. Thank you. Hello, Mr. Hockman. Good morning, Your Honors. May I please the court? Rob Hockman for PayPal. I'd like to start with the PayPal giving fund issue, being able to invoke the arbitration agreement. Then I'll turn to the mailbox rule, and then clean up the various other issues at the end. Starting with the PayPal giving fund, Judge Schrader, you're exactly right. Delaware law does apply here. And the reason Delaware law and not Illinois law applies here is because nobody asked for Illinois law to apply in the district court. So the arguments based on Illinois law are completely weighed. Why? Mr. Hockman? Why? I'm a little surprised to see. You weren't at the brief, were you? I was not. OK. But I thought we generally went with a presumption that you apply forum law unless and until somebody argues otherwise. Well, but we did argue otherwise, and they argued otherwise. They argued for Delaware and California law. We argued for Delaware law. The district court said there's really no basis for California law at all, so let's just go with Delaware law. So basically a menu was put in front of the district court. The district court made a perfectly sensible decision and applied the standard from insight in Delaware law. Now, you heard an argument today about Delaware law and why they would still prevail under Delaware law. I think it's wrong, but maybe the most important thing to say about it is it's not in the brief. It's not in the appellate brief. There wasn't even a suggestion that they could satisfy the insight standard to the district court. And so once the Delaware law issue was decided, the question about whether PayPal Giving Fund could invoke the arbitration agreement was followed. Just finally, the last thing to say about this, the notion that the fraud claim is somehow completely separate or independent, not completely and entirely intertwined with the PayPal agreement is belied by the record. First of all, she made the donations through PayPal. That's the whole point. That's the whole reason we're here. She decided to use PayPal to make these donations at the last minute of that year. But the second reason is what happened in the arbitration. When you can look at the arbitrator's award, you'll notice that the arbitration refers to breach of contract. When she got to arbitration, she was asked to submit a new complaint, and what she submitted, I don't know exactly what to call it because it was all somewhat informal, but what she submitted made clear that she understood her claim to be contract claim and fraud claims. They're all tied together. So in short, Delaware law applies. There's no real argument that that Delaware law standard would prevail, and there's no basis to apply Illinois law here. So with that, I'm going to turn to the mailbox rule. And Judge Hamilton, let's walk through how I understand the mailbox rule works, and we can hopefully come to an agreement about this. First, we put in evidence that we sent the notice, right? That evidence that we sent the notice is undisputed. She does not say a word. So when was it sent? It was sent, you know, in advance of the – When? I don't remember the exact date it was sent. We had nothing closer than October 2012. Right, that's right. By whom? It was sent by our system. This is all laid out in the McLean-Meehl-Anasuya's declaration. Well, it's not really laid out. It's in very broad terms kind of here's what would have happened, right? Well, here's our ordinary course of business. Yes, exactly. And then do we know which batch it was part of? Do you have a copy of it? So we don't have a copy of it. We don't keep copies of all of them. That's not our ordinary practice. That would be an enormous, enormous burden on data storage, given the volume that we're talking about here. Well, okay, but you see my point. I understand. You've offered evidence, as I suggested to Mr. Lending. I think that's enough to support an inference. It would support a finding that you sent it. I don't see how it's conclusive. And I don't see how the mailbox rule is conclusive about anything here. So the way I think about it is the mailbox rule, there's a question of whether we sent a notice, right? And the question is what is that evidence that we sent a notice? That's our declarations. That's our ordinary course. There's plenty of confirmation that people receive these. There's also, by the way, the provision that says we're also going to post this on our website. That's clearly in the record as well. So we have evidence that we sent notice. So now on that first question was notice sent. Is there a dispute of fact? No. There is no dispute of fact because she has nothing else. She has nothing to say in response to that. The only thing she has to say is that years later, when we sent a separate notice, not anything at issue in this case, we sent a separate notice. It went out to she knows somebody who got something before she did, but we send them in batches because the volume being what it is, the systems have to be managed in a certain way to make sure that it works. This is the ordinary course. If you don't find that sufficient, you are going to put, you're going to call into question. The question is not whether it's sufficient. The question is whether it's conclusive as to whether she agreed to this. So we've got the different parts of this. We've got the brief that you did not write declares this as conclusory and lacking foundation. I don't see how it's any different from it did not happen. So, yeah. So let me, let me, again, I'm trying to go step by step here because I think it's important. It is evidence of that we sent that is undisputed. Just like any other fact, undisputed evidence is we don't go to a jury. So there's no question. I don't want to interrupt you with your sequence, but can I just pause you on that? Because when I hear you say that, I think, what do you mean? It's not disputed. She swears under penalty of perjury. I didn't get it. Yeah. She might have a spam filter. I don't know. I have no, this is, this is judge Rovner's point, but why isn't that joining issue with your contrary contention? So this is where the, this is, this is where the rubber hits the road on the mailbox. Okay. So once you have sent you, that's what triggers the mailbox. We agree with that. You have to put in evidence that you send it in order to trigger the mailbox rule. What does the mailbox rule do? It creates a presumption on upon evidence of sending that it was received in red. And is that irrebuttable? It is not irrebuttable. It is not irrebuttable as a matter of law. And we are not saying that, but judge Rovner said, though, is right. It is not enough to simply say, I did not receive it. Bear nothing. If I ask you, did you kill cock Robin? You say no. Is that conclusory? Um, well, I mean, it is, it is conclusory, but it's certainly, it's a fact, right? It's assertion of fact under oath in which, in which the fact finder could assess my credibility. I agree with that. Right. But the mailbox rule, this is where, this is what's so important. If the question, if you judge Scudder suggested, maybe we send it back for a fact about a trial on this issue. What is that trial going to do in your case? Your honor, the trial is going to assess my credibility. Did I, did I receive it? Because the mailbox rule says once you've sent, um, receipt in red is, is, um, is presumed her statement. I didn't receive it is not an answer because the whole point of the mailbox. Why do you say it's presumed we've got, we've got some loose language in our ball opinion about this. Um, it doesn't even require proof of sending, but the, the K, the eighth circuit case it's cited makes very clear. All it's talking about is a permissible influence. That's right. That's right. What I'm trying to get at is what is the, what would there be a trial about here? So can I tell you what was running through my mind? Yeah. Okay. When I read the, uh, McElmeel, McElmeel McElmeel. Okay. When I read his declaration, I thought there was something missing between paragraph or right around paragraphs five and six in the missing was either one of two things was either like a screenshot copy of her email address and say, well, we don't keep it because there's tens of millions. Okay. That way. Or number two, a statement. We don't have that. Okay. Because we don't retain that, but I am positive for the following reason that that email was sent to her account. And here's why that, those one or two sentences are missing. And I don't, you might think, well, boy, this is hyper-technical or something. But I say it, when I look at the language he used, I think this is PayPal. They have very good in-house counsel. They got outstanding outside counsel. These words are carefully chosen would have been within the group. And why did he word it that way? Because he can't go further. That's, that's what's running through my mind. So you can tell me that's misguided. It's mistaken. I guess what I would tell you is it's enough because he, he doesn't know personally can't remember having seen, and he wouldn't have looked at any particular list, but when he calls when he calls it and they say, we can't give you a screenshot, we don't keep that. I mean, these are tens of millions. We don't keep that. Right. Okay. But when he asked the next question, what can I say in this sworn declaration? Because we have to prove, take this out of a trial context that that email was sent to her. And he says, we send it to everyone who has an active account. That's what he says in that, in that affidavit, every single person who has an active account. If she, if she had changed the email associated with her active account, she said that this again, goes back to what judge Rotner said. She says, Oh, well, between when I signed up and when I, um, I, I, I, I, and the time that this was sent, but then she comes back and says, that would be, that would be, we would have an interesting discussion. We might have something to think about there, but we don't have anything to think about because how can she prove a negative in response to that? She just knows she has to prove circumstances that might explain why the bear, there are plenty of circumstances where the bear absence of her receipt of that email would not obviate its authoritative control over this case. If she has a spam filter associated with that email address and the affidavit said exactly what you think it should say, judge Scudder, we win because that's what the mailbox rule does. The same way the mailbox rule says, I don't care if you've got a piece of mail and threw it away without opening it. You're bound. You're bound. That's the whole point. I guess what we have to decide is, is the declaration sufficient to trigger the application. And I think it is your honor. I think it is. I don't think, and I think it would be a heavy burden actually to expect companies to say more than we have whole systems built to send information out to our customers. We communicate with them on a regular basis and the ordinary course when we do this, people receive it. And that's the, that is the mailbox. And that's, this, this starts to feel like shrink, shrink, wrapped arbitration contracts of adhesion. And I don't know what happens in a jury trial on this issue. I also am not sure how clearly you can separate the question of sending and receipt here. Do you see a difference between to go back to the Tinder case? I don't remember X happening and X did not happen. I see a difference if X did not happening is accompanied by something else. But when X did not happening is naked is bear. It is the same thing as I do not remember X happening. There can be nothing more than that. Why is that? Because it's because they are synonymous at that point. No, they're not. I don't remember getting the light green or red. It was green. I don't remember the light being red or I don't remember, I don't remember the light being red is the same thing as the light was green. It's, it was one, I'm assuming it's not yellow. It was one of the other. But my point is you have, you have a binary option here. She either received it or didn't. But the, and, but this is the point about the mailbox rule. Again, if she, if she has her system set up so that a message like this gets diverted, it's binding on her. She can be true. There is no fact to try if the jury credits. Yeah, I believe you. You didn't receive it. I, I, I, I get, I get spam all the time. So where we, where do we, Mr. Hoffman, where do we find a, the law that says the mailbox rule is conclusive? So it's not, I'm not taking that position. Okay. I am not taking that position. I am taking the position that when there's no dispute of fact as to sending the receipt, it's triggered. And when the mailbox rule is triggered, you need something to overcome the presumption that the binding, that the site, the receipt and binding nature of it was, was. And where, where do we get that? It's not the eighth circuit that we, that we quoted in or cited in ball. Right. Yeah. But I think, I think that's essentially Tinder. Now Tinder said, I don't remember. That's true. But I think, but I don't remember that distinction. Well, a, I don't think the distinction holds up, but the, I don't remember matters only because if you have nothing to put on the scale against the evidence, I don't disagree with you about it, Mr. Hoffman, I don't disagree with you about that. Yeah. But I think there's a big difference between, I don't remember X happening and X did not happen. And I would in essence be implicit and I would have remembered if it did. Hence my, did you, well, I would have remembered, I would have remembered if I did because, you know, I keep these things in a special folder. That's a different case. I would have remembered because I, you know, I can tell you the date I received this one and this one and this one and this one, that's a different case. But when you have nothing, it's literally, I mean, read the declaration. It's, it is literally the words. I did paragraph seven. I did not receive the email attached as exhibit two to the Squires declaration. That's it. How about did you sign the contract? Is this your signature? No. Well, but then that would be tried as a matter of fact. And we put in evidence that, you know, somebody else would say you were there. You have, you have a signature, you have an objective, you have something you can measure it against. The whole point of the mailbox rule. You've got a triable issue. But the whole point of the mailbox rule is once you send it, the, what happened, the person does, what happens to what, what was sent is not enough to relieve the person of the obligation that binds them. Unless you have something more than just, it didn't get to me. It didn't get to me is not enough. That's the, that is the reason the mailbox rule and the mailbox rule has to work by the way, because we, of course, can't be inside anybody's home when the envelope arrives and says, Oh, and say, open it. We can't be sitting next to them. When the email arrives, we can't say, go into your spam filter and get it. Why not do it? We want to change this, acknowledge this, that you accept. Well, we, we, we did that. It was just in inverse. We gave them the option to opt out. It was the inverse. We gave them an explicit agreement, but there's no law. And there's no argument that if she received that email, the failure, the act, the fact that we offered, no, but you're making a policy argument that says that, uh, insisting on more is unworkable for insisting on more from you all would be unworkable. And I'm suggesting maybe it's not, you just, well, it's not the law you're on or that, that, that would be not that. And it would, and it would be novel and it's not argued that, that having us have to, um, affirmatively receive confirmation of agreement to arbitrate. And I respect the arguments about knowing involuntary waiver, but the law is quite clear. Once there is a binding contract to our, to arbitrate, well, that's, that's the boundary. That's the question, right? But, and that's just governed by contract formation rules, pure and simple, no layer of knowing involuntary anything. That's, it's not, not, it's not governed by waiver rules. It's contract formation rules and it's ordinary contract rules. So if you're going to go in that direction, you have to change ordinary confirmation, ordinary contract formation rules for arbitration purposes. And the Supreme Court says, don't do that because arbitration contracts are... I beg your pardon, Mr. Harkman, but why is it not reasonable to expect both sides to agree to a modification? We, it's entirely reasonable. I thought that was pretty basic. Absolutely. It's absolutely what happens in these situations. That's what the, that's what ordinary contract law treats these situations. For every other term, nobody has any question about that. So if you're going to treat arbitration differently, if you're going to treat arbitration differently, you have to have a reason. And the Supreme Court says, don't treat arbitration contract formation differently than other contract formation. That's a, that's a, that's a bedrock rule of arbitration law. So just very, very quickly on the background and on the procedures in the arbitration, I don't want to spend a lot of time on that. Um, I just, about the background and what actually happened, just, I've just, it's just worth reminding that, um, all of that is literally not in the records, just allegations in her complaint. I, you know, so I'm not going to, it's not an issue. It's not on the record. I'm not really going to address it, but there was an arbitration and that's where, where it was addressed and we prevailed and we prevailed for all the reasons judge Roedner pointed out. The procedure in arbitration was hardly unfair. She had every opportunity to make every argument, anything that she wanted to display, uh, at the arbitration hearing, as far as we know, either had been submitted or was just demonstrative of something else that had been submitted. The arbitrator had all the information in front of him and he understood the case. Um, she wanted to make a donation. The PayPal process didn't move with the dispatch she had hoped and expected when she donated at the 11th hour. Uh, ultimately it did. So there was nothing to do. There was nothing further to think about in the case. Uh, and with that, your honors, unless there are further questions. What do you think about the question, Mr. Hockman, about jurisdiction over the charities? Um, this is, I know it's not directly at issue here, but there was a fair amount of discussion about jurisdiction. Uh, I would think that an arbitration defense, including an arbitration defense that says no class arbitrations is a waivable defense, correct? I would think that's right. Yeah. So why would it be frivolous to, to file such a claim, um, that may, where the defense may or may not be invoked and may or may not be contestable? Well, as your honor indicated, um, there's no issue before this court about the correctness of the dismissal of the, uh, uh, charity plaintiffs. I'm asking you what you think about it. What do I think? I think, I think it was, I think it's questionable. I would also, to the extent that you're curious, I would also note there was a Lanham Act claim in this case. Lanham Act claim kind of makes federal question jurisdiction present. So nobody asserted it, nobody talked about it, but it seems to me it was that. Use of trademark. Sure. Yeah. With or without authorization. So, okay. Thank you. Thank you very much. Why don't we give Mr. Lending, uh, three more minutes. I want to address quickly the choice of law provision, uh, that was set forth very extensively in the reply brief. And there, because there is no contractual agreement between Ms. Cass and PayPal giving fund PayPal giving fund in the user agreement, cannot rely on the Delaware choice of law provision. And the defendants would need to articulate why the district court should disregard Illinois law. And they have not done so. They have not demonstrated that there is a conflict with the law. Is it your, is it your position though, that in the district court, you were pressing an application of Illinois law? We had cited both Illinois and Delaware cases, and we made the arguments that either under either it should, uh, that she did not agree to arbitrate. We had cited both Illinois and Delaware cases, and it was not specifically pressed, but we have made the argument that with respect to the choice of law provision, the presumption is the forum state law applies unless the defendants can show and demonstrate an actual conflict. It sure seemed to me in reading the briefs that choice of law issues have come into focus much more on appeal than they were in the district court that in the district court, every people were just throwing around the park, the Delaware, Illinois, California law. Yeah. And I would know everyone. Yeah. And I would note, uh, your honor, that, uh, that this cast was pro se when she drafted the arguments, uh, to judge Packle. However, we think that it is clear that the defendants it is incumbent upon them. If they want to ignore or go outside of the forum state, they have to demonstrate that the Illinois law is in conflict and they haven't done that. As to the second point that council made, which is that we did not argue that the Delaware law even under Delaware law, uh, we, we win. It was clearly set forth on pages 40 and 41 of our appeal brief. We've spent two pages saying that under the insight case, we, uh, we, we should not be compelled to arbitrate because the user agreement, uh, that claims against, uh, the consumer claims do not arise or depend on that. Uh, as to the point regarding the notice being sent, this court is correct in looking at that issue. It's a fundamental issue. Did she voluntarily agree and knowingly agree to give up her right to an article three tribunal? I would refer the court to the Gupta V Morgan Stanley. It's a trial court decision, but the court went through a very detailed analysis of the distinctions between Tinder and long Gardner. And on, uh, page on the fourth page, it says Tinder can be read along long Gardner to impose a straightforward rule. When the plaintiff submits an affidavit stating that he does not recall receiving a letter, there is no tribal factual dispute, but when the plaintiff submits an affidavit in which he denies receiving the letter, as Ms. Cass did here, a tribal dispute exists here. Uh, I just want to note that the defendants never said that it was actually sent to Ms. Cass. Ms. Cass said that, uh, she didn't receive it. All they said is she would have been within the group of recipients that would have received it. Forgive me, but what is the long Gardner case you're referring to? The long Gardner case in Ray. Okay. Yeah. In Ray long Gardner. Okay. And that in that case, there was a specific denial and that's what we're claiming applies here. I want to thank the panel for their time. And, uh, uh, the panel wants to thank Mr. Lending and Mr. Hoffman for, um, their advocacy. Thank you.